**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL MEDICAL CARE, INC.<br><br>Plaintiff,<br><br>v.<br><br>SARDAR AHMAD SHARIF,<br><br>Defendant. | CIVIL ACTION NO. _____ |

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**
**AND JURY DEMAND**

Plaintiff National Medical Care, Inc. ("Plaintiff") by and through its attorneys, for its Complaint for Equitable Relief and Damages against Defendant Sardar Ahmad Sharif, M.D. ("Defendant" or "Sharif"), alleges as follows upon personal knowledge as to its own acts and upon information and belief as to all other matters:

**INTRODUCTION AND NATURE OF THE ACTION**

1. This action arises out of Sharif's breach of his post-employment obligations set forth in the Employee Confidentiality, Assignment and Protective Covenants Agreement dated December 10, 2017 (the "Agreement"), a copy of which is attached hereto as Exhibit A. Effective on or about January 1, 2018, Sharif was promoted to the position of Senior Vice President, Chief Medical Information Officer of Plaintiff, and in connection with that promotion, he entered into and agreed to be bound by the Agreement. In this senior executive role, Sharif was one of the six highest-ranking medical officers within North America for Fresenius Medical Care North America and its affiliated entities, including Plaintiff (collectively, "FMCNA"), and

he was responsible for the overall clinical information technology systems for North America.[1] This responsibility included direct supervision of two senior personnel and ultimately overseeing the managerial, operational and market development of all clinical information technology ("IT") governance, change control management, decision support and workflow support in service to FMCNA's patients. When employed in his senior executive role for FMCNA, Sharif had access to, and indeed was required to know and use FMCNA's highly sensitive trade secrets and confidential information, including without limitation prioritization of any IT related systems and tools, functionality, features, and direction that are and have been central to the health IT infrastructure of FMCNA; future strategies related to FMCNA's evaluation, prioritization, adoption and proprietary modification/application of software and technologies; and FMCNA's challenges with software and technologies. Moreover, because of his senior position within the IT infrastructure, Sharif was privy to confidential clinical standards, business plans and strategies throughout FMCNA.

On Monday, July 27, 2020, Sharif abruptly and without warning informed FMCNA of his intent to resign from his position, notifying his manager that he intended to accept a senior executive position with FMCNA's direct competitor, United States Renal Care, Inc. "("USRC"). Sharif's actions violate his Agreement with Plaintiff, and his employment at a competitor would inevitably result in the disclosure of confidential information and trade secrets in violation of the Massachusetts Trade Secrets Act, M.G.L. c. 93, § 42, *et seq*. ("MTSA") and the Defend Trade Secrets Act, 18 U.S.C § 1831, *et seq*. ("DTSA").

---

[1] "FMCNA" refers collectively to Plaintiff National Medical Care, Inc., and its parent company Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America, and any related affiliate.

Sharif's employment by USRC violates the express terms of the post-employment protective covenants in the Agreement he entered into in connection with his employment with Plaintiff. Sharif's competitive activities are improper competition, and the harm to Plaintiff is immediate and irreparable. Sharif's actions severely imperil FMCNA's trade secrets and confidential information, as it is inevitable that he would disclose such information to his new employer, USRC, and they further imperil FMCNA's goodwill.

## PARTIES

1. Plaintiff is a corporation organized under the laws of the State of Delaware with its principal place of business at 920 Winter Street, Waltham, Massachusetts.

2. Defendant Sadar Ahmad Sharif, M.D. is an individual who, upon information and belief, resides at 2112 Cheyenne Park Lane, Southlake, Texas.

## JURISDICTION AND VENUE

3. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity between the parties and the amount in controversy exceeds $75,000.

4. The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims under the DTSA.

5. Personal jurisdiction exists over Sharif under M.G.L. c. 223A §§ 1 and 3 because he transacted business in the Commonwealth of Massachusetts, including but not limited to being employed by Plaintiff, a Massachusetts entity; executing the Agreement with Plaintiff; maintaining an office at FMCNA's headquarters in Waltham, Massachusetts; visiting FMCNA corporate headquarters in Waltham, Massachusetts; and FMCNA's payroll and treasury departments reside in the corporate office in Massachusetts. Moreover, the Agreement expressly provides that it "shall be interpreted and enforced in accordance with the laws of the Commonwealth of Massachusetts…."

6. Venue is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

*FMCNA's Business*

7. FMCNA and its global affiliates are the world's leading provider of products and services for people with chronic kidney failure. Around 2.8 million patients with this disease worldwide regularly undergo dialysis treatment. Dialysis is a vital blood cleansing procedure that substitutes the function of the kidney in case of kidney failure.

8. Through its affiliates and divisions, FMCNA engages in business impacting chronic kidney care, as well as related services. Among the divisions and affiliates of FMCNA are the following:

- Acumen Physician Solutions, which develops intuitive software tools to assist nephrologists in the practice of medicine.

- Frenova Renal Research, which is the world's only contract clinical research services provider dedicated to improving the lives of those with kidney disease.

- Fresenius Health Partners, which monitors and manages individuals with kidney disease.

- Fresenius Kidney Care, which serves over 190,000 patients in over 2,400 facilities nationwide by providing dialysis treatment options for those suffering from chronic kidney disease and end stage renal disease. Treatment options include at-home peritoneal dialysis, at-home hemodialysis, in-center hemodialysis, and acute care services in more than 1,200 hospitals in the

United States. Fresenius Kidney Care provides home delivery for equipment and supplies, and patient travel services, among other services.

- Physician Practice Services, which assists medical practices with growth and management, as well as technology solutions to help nephrology practices succeed.

- Renal Therapies Group, including NxStage Medical, which deliver hemodialysis and peritoneal dialysis equipment, ancillary products and renal pharmaceuticals for patients in clinical and home environments.

- Spectra Laboratories, which provides renal-specific laboratory services.

9. The industry in which FMCNA operates is highly competitive.

10. IT strategies and solutions are a vital part of the success or failure the treatment of those with kidney-related problems. IT strategies and solutions are intimately tied to the business workflow and strategies of those with chronic kidney disease and in particular, in the operation of clinics and at home treatment options. The ability to accurately, efficiently, safely and conveniently obtain and analyze patient-related data in a user-friendly manner is crucial for both dialysis treatment monitoring and planning. FMCNA has developed and continues to develop innovative IT solutions to assist healthcare professionals in caring for their dialysis patients and maintaining a sustainable business that serves patients for their kidney-related needs.

11. As FMCNA explains on its website, "Developing products and systems that provide a high level of safety and user-friendliness and enable tailoring to individual patient needs is an inherent part of our strategy of sustainable and profitable growth. We will continue to develop ever more effective products and treatment methods for critically and chronically ill

patients to offer best-in-class medical standards." (*See* https://www.fresenius.com/goals-and-strategy, last accessed on August 3, 2020).

12. FMCNA has developed its technology infrastructure through the investment of significant time and resources. Information about its IT, including strategies, pipeline of solutions, and challenges, is not generally available to the public. If disclosed, this information would give any FMCNA competitor an unfair competitive advantage.

13. Sharif's knowledge of confidential information and trade secrets is not limited to his knowledge of FMCNA's strategies and plans with respect to IT. First, FMCNA's IT strategy runs parallel with its overall strategy and business plans. Second, by virtue of his senior position, Sharif was also exposed to national strategic plans of FMCNA's businesses, as he worked closely with many division lines of business.

14. In addition to asking employees to sign agreements which contain covenants that protect FMCNA's trade secrets and confidential information and require the return of FMCNA's property upon termination, FMCNA takes the following measures to protect its trade secrets and confidential information: (a) prohibiting the use of FMCNA materials for purposes not directly related to its business, or the removal or borrowing of its property without permission; (b) using badge IDs to restrict access to and within its facilities; (c) prohibiting the use of its computer systems for noncompany purposes; (d) restricting access to its computerized information through the use of passwords; and (e) restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

*Sharif's Employment*

15. By way of offer letter dated July 31, 2015, Plaintiff hired Sharif as Vice President, Clinical Health Information. As set forth in his offer letter, Sharif's employment was

conditioned upon his execution of an Employee Confidentiality, Assignment and Protective Covenant Agreement that contained protections for confidential information, as well as a one-year nonsolicitation and one-year noncompetition clause similar to those found in the Agreement. At the time of his hire, Sharif was paid at the base annual salary rate of $263,000, was provided a $30,000 sign-on bonus, and was eligible to participate in various bonus and incentive programs for executives.

16. Sharif is a trained surgeon, although he does not practice medicine.

17. At the time of his hire by Plaintiff, Sharif had experience in healthcare and IT, but had no experience working as a nephrologist treating those with chronic kidney disease.

18. Sharif's position with FMCNA at the time of his hire was his first employment in the kidney-care space.

19. By way of offer letter dated December 7, 2017, Plaintiff promoted Sharif, effective January 1, 2018, to the position of Senior Vice President, Chief Medical Information Officer with an annual salary of $425,000, and eligibility to participate in various bonus and incentive programs for executives.

20. FMCNA supported Dr. Sharif in his request for a relocation package for him and his family.

21. In connection with his promotion, Sharif executed and became bound by a new Employee Confidentiality, Assignment and Protective Covenants Agreement dated December 10, 2017 (the "Agreement"), a true and accurate copy of which is attached hereto as Exhibit A.

22. On April 4, 2019, Plaintiff and Sharif entered into a Retention Agreement whereby Plaintiff received a bonus of $120,000 for remaining employed for one year, and would have received a bonus of $80,000 had he remained employed at Plaintiff for two years.

23. In 2019, Sharif's last full year of employment with Plaintiff, Plaintiff paid Sharif wages in the amount of $569,761.18.

24. By virtue of his senior leadership position, Sharif had access to, used, and knows FMCNA trade secrets and confidential information as it applies throughout the United States.

25. In his role as Senior Vice President, Chief Medical Information Officer, Sharif was responsible for the overall clinical IT technology for all of the North American divisions and business units (most of which are listed above). This responsibility required him to provide strategic leadership of overall objectives for IT as it applied to clinicians, patients and patient data. Sharif acted as the bridge between clinicians (doctors, nurses and patient care technicians) and IT related not only to FMCNA's work with dialysis patients and the medical staff, but also the core of FMCNA's physician relationships fostered and developed around technology.

26. By way of example, Sharif participated in a weekly telephone call of approximately six (6) Chief Medical Officers of FMCNA, as well as the global Chief Medical Officer, Dr. Franklin Maddux. During these calls, these executives discussed medical initiatives, future plans, and other practice- and patient-specific information across all business lines that is not generally known to the public. Sharif also discussed his group's technological strategies, challenges, and successes.

27. Sharif regularly attended regular corporate and divisional Medical Advisory Board meetings. At these meetings, Sharif either presented or listened to discussions of confidential information and trade secrets related to patient care and FMCNA performance metrics. Such confidential information includes clinical standards of FMCNA, and where FMCNA is succeeding and where it faces challenges in its clinics.

28.     Sharif regularly presented to FMCNA's joint venture partners (who themselves are FMCNA employees or business partners with a responsibility to maintain confidentiality). During these meetings, Sharif would share with FMCNA's joint venture partners the technology successes within the organization and future strategies for FMCNA with respect to technology.

29.     Sharif regularly attended the executive Fresenius Kidney Care ("FKC") Leadership Meeting hosted by Michael Asselta, President of FKC.  At the FKC Leadership Meeting, extensive confidential information about the entire FKC organization is shared and discussed among executives, including financial information about clinics, opportunities within markets, budgets, business pipelines, and risks for the organization throughout the United States. The meetings including long-term and short-term strategy discussions, which are not known outside of FMCNA's organization.

30.     Sharif acted as the Chairperson for the Fresenius Technology Council ("FTC"), a group of senior leaders who review submissions for potential clinical investments and decide which, if any, of those projects the company would invest in and become part of FMCNA's strategic focus.  The information related to this pipeline of potential and actual technology projects is a trade secret and confidential information.

31.     Sharif had access to and knowledge of additional confidential information and trade secrets related to value based care and managed care strategies, as well as clinical algorithms and protocols that are proprietary and confidential to FMCNA.

32.     These are only a few of the examples of confidential information and trade secrets to which Sharif had access to and/or was responsible for during his employment at Plaintiff, and if known by a competitor, would provide the competitor with an unfair advantage.

33.     By virtue of his senior leadership position, Sharif also met with physicians and other partners of FMCNA and developed relationships with those individuals.  The identities of these physicians and other partners, and their preferences, experiences and challenges with technology, is a trade secret and confidential information which, if known by a competitor, would provide the competitor with an unfair advantage.

34.     Upon information and belief, Sharif continued to sit in on senior executive meetings and learn updated confidential information and trade secrets of FMCNA, even after he had begun the interview process and received an offer to join FMCNA's competitor, USRC.

*Sharif's Post-Employment Obligations*

35.     In his Agreement, Sharif agreed to various restrictive covenants related to his duties at FMCNA.  As set forth in more detail in the Agreement, Sharif agreed that during or after his employment, he would not use or disclose any confidential information of FMCNA (Section 3(a)), and that he would return to FMCNA all company property (including electronic information) in his possession upon the termination of his employment.  (Section 3(b)).

36.     In his Agreement, Sharif agreed that for one (1) year following the termination of his employment, he would not (i) work for or in furtherance of any Competing Business within the Restricted Area in circumstances where his duties, services and/or responsibilities are the same as or substantially similar to any duties and responsibilities he performed for the Company during the Look Back Period or that are otherwise likely or probable to result in the use or disclosure of Confidential Information; or (ii) perform for any Competing Business any management, planning, consulting, market development or operational functions or services within the Restricted Area which are the same or substantially similar to any of the functions or

services which he performed for the Company during the Look Back Period.  *See* Agreement at Section 5(b), Ex. 1.  The capitalized terms are defined in the Agreement.

37. The "Restricted Area" is defined in the Agreement as "the territory or territories or other geographic areas in which the Company does business and as to which I performed services; had managerial, operational, or market-development responsibility; and/or about which I had access to Confidential Information, during the Look Back Period." *See* Agreement at Section 5(a)(vii), Ex. 1.

38. The Agreement contains prohibitions of Sharif from soliciting customers, patients, physicians, suppliers, vendors, and FMCNA employees for a one (1) year period after the termination of his employment, as set out in Sections 5(c)-(e), Ex. 1.

*Sharif Resigns to Join USRC*

39. On July 25, 2020, Sharif became vested in one of FMCNA's long term incentive plans.

40. On Monday, July 27, 2020, Sharif, informed FMCNA of his intent to resign and accept a position at USRC.  Thereafter, FMCNA engaged with Sharif in an effort to convince him to remain at FMCNA, but on July 30, 2020, Sharif confirmed to FMCNA that he would be accepting employment at USRC.  Sharif's employment at FMCNA terminated effective July 29, 2020.

41. Sharif informed FMCNA that he intends to commence employment at USRC imminently, although he did not provide an exact start date.  Sharif informed FMCNA that he would be hired at USRC as its "Chief Administrative Officer."

42. Upon information and belief, Sharif will be working for USRC in the United States, out of its Texas headquarters where Sharif will be one of the highest-level executives at the headquarters of USRC.

43. Sharif's duties, services and/or responsibilities at USRC are the same or substantially similar to any duties or responsibilities he performed for FMCNA.

44. Sharif's duties, services and/or responsibilities at USRC are such that he is likely or probable to use or disclose FMCNA's Confidential Information in performing them.

45. Sharif will be performing for USRC management, planning, consulting, market development or operational functions which are the same or substantially similar to those he performed for FMCNA during the last two years of his employment.

46. USRC is a direct competitor of FMCNA.

47. USRC is a "Competing Business" within the meaning of the Agreement.

48. USRC partners with physicians across the United States to operate outpatient, home and specialty dialysis programs to serve people living with chronic and acute renal disease. Upon information and belief, USRC serves approximately 26,000 patients in 339 dialysis facilities across 31 states and the Territory of Guam, and earned approximately $1.3 billion in revenue in 2018.

49. At the time of his resignation from employment, Sharif knew that USRC was a competitor of FMCNA.

50. Sharif's employment at USRC will violate the one-year non-competition provision in the Agreement, which commences on Sharif's termination date of July 29, 2020.

51. Permitting Sharif to be employed by, and continue his employment with, USRC would give USRC an unfair competitive advantage over FMCNA in as much as it is inevitable

that Sharif will, in the performance of his duties for USRC, use and disclose FMCNA's trade secrets and confidential information and harm its goodwill.

## COUNT ONE
## BREACH OF CONTRACT

52. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

53. There exists a valid and binding Agreement between Plaintiff and Sharif. (Ex. 1).

54. The Agreement was made for valid consideration.

55. The Agreement is reasonable, consonant with public policy, and is necessary to protect the legitimate business interests of FMCNA.

56. The Agreement is reasonably limited in scope and narrowly tailored to protect FMCNA's legitimate business interests.

57. FMCNA has a clearly ascertainable right to protect its goodwill, confidential business information and trade secrets and to enforce the Agreement's restrictive covenants.

58. Sharif breached his contractual obligations to FMCNA by providing services to and on behalf of USRC and by virtue of the nature of his employment with USRC.

59. FMCNA will suffer, and continue to suffer, irreparable harm as a result of this breach, and threatened breach. FMCNA is threatened with losing the value of its trade secrets and confidential information and certain clinician and customer relationships and goodwill. FMCNA has also suffered monetary injury as a result of Sharif's breach, in an amount to be proven at trial.

## COUNT TWO
## MISAPPROPRIATION OF TRADE SECRETS – MTSA

60.     Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

61.     FMCNA's company confidential information as set out above, including but not limited to IT programs, strategies, successes, challenges, strengths, weaknesses, busines strategies and plans, physician information, financial data, patient and clinician software strategies, technology projections, trends, and analyses, growth opportunities, clinic information, and market information, and other nonpublic proprietary information constitute trade secrets within the meaning of the Massachusetts Trade Secrets Act, M.G.L. c. 93, §§ 42, 42A-42G ("MTSA").

62.     FMCNA's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by proper means by, the public, and other persons can obtain economic value from their disclosure and use.

63.     At all relevant times, FMCNA has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its information and business intelligence, including trade secrets. Such measures include, without limitation, promulgating corporate policies and requiring employees to contractually agree not to disclose confidential information.

64.     Sharif had substantial and ongoing access to FMCNA's trade secrets as a result of and during his employment with FMCNA.

65.     Sharif gathered and exposed himself to FMCNA's trade secrets even when he was in the process of obtaining employment with USRC.

66.     Sharif took and retained FMCNA's trade secrets after he accepted employment at USRC.

67. Sharif retained FMCNA's trade secrets after he ceased being employed by FMCNA.

68. Upon information and belief, Sharif disclosed FMCNA's trade secrets to USRC and/or has misappropriated or threatens to misappropriate FMCNA's trade secrets through his employment with USRC in violation of the MTSA.

69. Sharif misappropriated and/or threatens to misappropriate FMCNA's trade secrets through improper means.

70. Sharif's conduct was willful and malicious within the meaning of M.G.L. c. 93 § 42B(b).

71. By misappropriating and/or using FMCNA's trade secrets, Sharif has created an unfair advantage for USRC in competing with FMCNA, including USRC acquiring a valuable roadmap for competing with FMCNA's technology infrastructure and USRC being able to target FMCNA's relationships and goodwill with its clinicians and customers, at FMCNA's expense.

72. As a result of Sharif's violation of the MTSA, FMCNA has been injured and will continue to be damaged by losses of, among other things, customers, revenues, valuable proprietary information and goodwill.

**COUNT THREE**
**MISAPPROPRIATION OF TRADE SECRETS – DTSA**

73. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

74. FMCNA's company confidential information, as set out above, constitutes trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").

75. FMCNA's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by proper means by, the public, and other persons can obtain economic value from their disclosure and use.

76. The trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

77. At all relevant times, FMCNA has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its information and business intelligence, including trade secrets. Such measures include, without limitation, promulgating corporate policies and requiring employees to contractual agree not to disclose confidential information.

78. Sharif had substantial and ongoing access to FMCNA's trade secrets as a result of and during his employment with FMCNA.

79. Sharif gathered and exposed himself to FMCNA's trade secrets even when he was in the process of obtaining employment with USRC.

80. Sharif took and retained FMCNA's trade secrets after he accepted employment at USRC.

81. Sharif retained FMCNA's trade secrets after he ceased being employed by FMCNA.

82. Upon information and belief, Sharif disclosed FMCNA's trade secrets to USRC and/or has misappropriated or threatens to misappropriate FMCNA's trade secrets through his employment with USRC in violation of the DTSA.

83. Sharif misappropriated and/or threatens to misappropriate FMCNA's trade secrets through improper means.

84. Sharif's conduct was willful and malicious.

85. By misappropriating and/or using FMCNA's trade secrets, Sharif has created an unfair advantage for USRC in competing with FMCNA, including USRC acquiring a valuable roadmap for competing with FMCNA's technology infrastructure and USRC being able to target FMCNA's relationships and goodwill with its clinicians and customers, at FMCNA's expense.

86. As a result of Sharif's violation of the DTSA, FMCNA has been injured and will continue to be damaged by losses of, among other things, customers, revenues, valuable proprietary information and goodwill.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court:

1. Enter an order that Sharif and all parties in active concert or participation with him be preliminarily and permanently enjoined from (a) performing services for USRC anywhere in the United States for one (1) year following the termination of his employment at Plaintiff, (b) disclosing or using any of FMCNA's trade secrets, confidential information, or proprietary information, (c) destroying, discarding or altering, directly or indirectly, any FMCNA information or property, and (d) otherwise engaging in any conduct which violates the Agreement.

2. Enter an order that Sharif and all parties in active concert or participation with him be preliminarily and permanently enjoined for one (1) year following his termination from employment at Plaintiff from (a) soliciting or communicating with a Covered Customer, Patient or Physician for the purpose of (i) selling or providing the Covered Customer, Patient or Physician a Competing Product or Service, or (ii) inducing or encouraging the Covered Customer, Patient or Physician to end, or change to the Company's detriment the customer's, patient's or physician's relationship with the Company; (b) soliciting or communicating with a Covered Supplier or Vendor for the purpose of inducing or encouraging the Covered Supplier or

Vendor to end or change to the Company's detriment the supplier's or vendor's relationship with the Company; (c) soliciting or communicating with an employee of the Company for the purpose of inducing or encouraging the employee to leave the employment of the Company or to change an existing business relationship to the detriment of the Company; and (d) helping another person or entity hire away a Company employee (as all capitalized terms are defined in the Agreement).

3. Enter an order that Sharif and all parties in active concert or participation with him be required to return to Plaintiff all originals and all copies of FMCNA trade secrets, confidential information, proprietary information, or other property that may exist, in any form, that are in his possession, custody or control.

4. Enter an order that Sharif and all parties in active concert or participation with him be required to explain any use or disclosure of FMCNA's trade secrets, confidential information, or proprietary information, in sufficient detail to enable FMCNA to track down and recover all misappropriated information.

5. Award Plaintiff its reasonable attorney's fees and costs incurred in successfully enforcing the Agreement, as set forth in Section 6 of the Agreement.

6. To the extent necessary, enter an order that extends the restrictive covenants for "one day for each day [Sharif is] in violation of the restriction…" not to extend beyond one (1) year, as set forth in Section 6 of the Agreement.

7. Enjoin Sharif upon principles of equity, award Plaintiff damages and exemplary damages, and award Plaintiff attorneys' fees, as well as any other remedy available pursuant to the MTSA and/or DTSA.

8. Award Plaintiff damages in an amount to be determined at trial in the form of compensatory, unjust enrichment, actual, consequential and punitive damages.

9. Any such other and further relief that the Court deems fit and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims raised in its Complaint that are so triable.

    Respectfully submitted,

    NATIONAL MEDICAL CARE, INC.

    By its attorneys,

    */s/ Jeffrey S. Siegel*
    Jeffrey S. Siegel (BBO #647148)
    Sean P. O'Connor (BBO #673835)
    MORGAN, BROWN & JOY, LLP
    200 State Street, 11th Floor
    Boston, MA 02109
    (617) 523-6666
    (617) 367-3125 (fax)
    jsiegel@morganbrown.com
    soconnor@morganbrown.com

Dated: August 3, 2020